37 P.(2d) 805

**SANCHEZ et al. v. TORRES et al.**

No. 3862.

Supreme Court of New Mexico.

. March 27, 1934.

Rehearing Denied Dec. 5, 1934.

J. Lewis Clark, of Estancia, C. R. Brice, of Roswell, and Manuel A. Sanchez, of Santa Fé, for appellants.

George W. Prichard, H. A. Kiker, and A. M. Fernandez, all of Santa Fé, for appellees.

WATSON, Chief Justice.

Macario Torres died testate October 30, 1927. He left all his property to Maria A. de Torres, his widow. Julian Sanchez, born June 23, 1921, and Alejandro Sanchez, born June 29, 1924, sons of Elena Sanchez, appearing in this cause as their next friend, sued to establish rights of inheritance. They claimed to be illegitimate sons of the deceased (1929 Comp. St. § 38-114), and that not having been named or provided for in the will, they are entitled to share in the estate as if their putative father had died intestate (1929 Comp. St. § 154-112).

A former appeal of this cause resulted in a reversal for error in sustaining a demurrer to the evidence at the close of the plaintiffs' case. Sanchez v. Torres, 35 N. M. 383, 298 P. 408, 409.

The cause was reinstated in the district court and came on for hearing before Judge Armijo, sitting for Judge Frenger who had presided at the first trial.

By stipulation, a transcript of the testimony at the first trial was admitted in evidence, excluding only the testimony of Ida Garcia, the local registrar of births, whose testimony was alluded to in the former opinion. The findings are brief:

"First. That at the time complained of by the plaintiffs, the deceased, Macario Torres, was impotent and incapable of becoming the father of the minor children mentioned in the plaintiffs' complaint.

"Second. The court further finds that the testimony in the case, taken as a whole, fails to show that the said Macario Torres generally and notoriously recognized said children as his."

Upon these findings, judgment was rendered dismissing the cause. Plaintiffs have appealed.

The findings alone are challenged on this appeal. Appellants seek a general review of the record, which they contend will disclose a preponderance of evidence for their claims to be the sons of the deceased and to have had from him general and notorious recognition as such. They cite Davidson v. Enfield, 35 N. M. 580, 3 P.(2d) 979, to the proposition that, a part of the testimony having been given otherwise than in the presence of the court, we "will review the whole record and decide upon the weight of the evidence."

The case cited does not go to that length. It in fact expresses doubt of the matter. The leading case is Gallup Electric Light Co. v. Pacific Improvement Co., 16 N. M. 86, 113 P. 848, 850, where, as here, the trial court heard part but not all of the testimony. This rule was laid down: " * * * the decree * * * should not be affirmed, unless it is sustained by substantial evidence which the court heard, unless the additional evidence taken by the examiner shows that the decree was properly made and sustains it by a preponderance of the testimony, and all the evidence should be considered by the court, on appeal, so as to determine whether * * * the evidence sustains the judgment * * *."

The rule, thus stated in a case where the trial court had awarded affirmative relief, cannot be applied literally. It should no doubt be applied in principle, where, as here, relief has been denied. To overcome a negative decree, it will be necessary for appellant to show a preponderance of evidence for every fact essential to recovery. And, applying the principle stated, if the court heard the evidence as to some fact, the substantial evidence rule would apply as to it.

It might seem at first that the trial judge did hear all of the evidence as to impotency. So he did, in so far as it went directly to that point. But, while true, of course, that if the deceased was truly impotent he did not beget, it is just as true that if he begot, he was not impotent. So it is the larger question of parenthood that we are to consider. The trial judge heard the evidence only in part, and we must weigh it. The same

situation exists when we reach the question of recognition.

As we said on the former appeal, the case involves "* * * the usual features of direct evidence of paternity furnished by the testimony of the mother, testimony of association between the mother and the putative father, testimony of contribution by the putative father to the support of the mother and children, testimony of common report in Willard, where the affair took place and the children were born, that the deceased was their father, and testimony of direct and express admission on the part of the putative father in private conversation."

Actually we had before us the single question of recognition. The district judge had evidently considered, and we assumed, that plaintiffs had satisfactorily shown their ancestry. We have now reviewed the evidence in this regard. We need say no more than that we adhere to the generalization above quoted. Starting there, we must weigh the evidence and inferences contra.

Many, though by no means all, of the witnesses for the plaintiffs were related to them. This is not of great importance, since there is scarcely any direct contradiction of their testimony and no attempt at general impeachment.

As is usual in cases of this kind, defendants were able to produce a number of witnesses who had been more or less in a position to observe and hear, who had not seen or heard the things that the other witnesses had. Little weight can attach to this negative testimony.

The attempt to show that the mother was generally loose in her association with men was, in our judgment, a failure.

■ Two or three forged documents were offered in evidence on behalf of the plaintiffs. It is urged that this so taints their case with fraud that we should believe none of it. Certainly the plaintiffs themselves had no part in this. It is not shown that the mother had. Assuming, however, that the latter did yield to a temptation to manufacture this evidence, and that she is thus rendered unworthy of credit, the remaining evidence is so strong in corroboration of the main facts to which she testifies, that the fraud must be attributed to an unfortunate effort to multiply proof, rather than to the falsity of the other facts she relates.

We cannot doubt that, from 1918 to the time of his death, the deceased sustained constant and intimate relations with this widow, to whom, during the period, these children were born; that he practically assumed the burden of their support; that his conduct was entirely consistent with, and highly persuasive of, his own entire conviction that the children were his; and that there is no substantial evidence of any other source of their being.

All this comes to naught, however, and mystery results, if the deceased was incapable of procreation.

■ The claim of impotency rests upon the testimony of his widow and of two physicians. The former testified simply that about ten years before her husband died (about the time when the deceased commenced to main-

tain another woman in another home) her sex relations with him ceased. Asked, "Do you know why?" she replied, "On account of sickness, I suppose, and his old age."

Dr. Espinosa testified that the deceased consulted him in 1923, and that he examined and treated him; saying further, in substance, "My first information on physical examination was the history of the case, and he stated to me that he was unable and he was sick, and unable to practice the sexual act. That was the history of the case. He said that condition had existed for some months. I couldn't state how long. Then, upon examination, I found he was very nervous and excitable, worried, and the physical examination also revealed to me that he had the condition which he stated. I think he was a man of 60 or 65; might have been older. He seemed to be weak. I gave him four or five months attention, my treatment having no results. I gave him advice. I put him on a diet and mostly rest, and (told him) to forget about those conditions that existed with him, and forget about his inability to do the sexual act, and rest for a year or so, and that the thing might come back natural. I didn't give him much medical assistance. He visited me once or twice a month. I don't recollect. It might have been he was more cheerful, and built up somewhat, but his main condition it didn't seem to improve."

Dr. Amble testified that he treated the deceased "practically all the time" from 1915 to 1919. "He was complaining about his strength giving away. It related to the sexual parts. I treated him off and on for that condition. He thus expressed his condition:

'I am cold, and can't have relations with women.' I treated him for that trouble. I left Estancia in 1921, but he sometimes came to see me in Mountainair. If I was not there he would see someone else, I expect. Up to January, 1921, he was under my treatment for that trouble off and on. Sometimes he would come once every two or three weeks, and then perhaps there would be a longer spell between. He always complained that that treatment wasn't very good, very effective. I don't believe I ought to say whether he was capable of procreating. That is a pretty hard question. At his age, and the condition he was in, he might and he might not. I would give it the benefit of the doubt. I had no way of finding out the contrary of his statement that he could not have relations with women."

Dr. Ottosen, called by plaintiffs, testified to having treated the deceased nearly every year for something, during the last 25 years of his life. Asked as to his strength and vitality during that period, he said: "Well, I would say he was a pretty good man for his age. Generally stepped around well." He said that he claimed to be nervous, but had never complained of being weak sexually. He testified that he would not be able from a physical examination to determine impotency and that he considered that "it would be impossible to determine that from outward appearances."

This medical testimony is not, in our judgment, of sufficient weight to overcome the other evidence as to paternity. It is necessarily based on statements of the deceased of a somewhat equivocal character. The one expert

was not asked, and the other declined to give, an opinion. We are unable to agree that the defense has shown the deceased to have been impotent to an extent or at times to render it impossible for him to have been the father of the plaintiffs, and we feel constrained to hold, on the weight of the evidence, that he was their father.

■ The question of recognition, also, may be taken up where we left it on the former appeal. We were then satisfied with the proofs. Wherein has the case been weakened by counter showing?

It is true that all of those who testified to express admissions of paternity, and most of those who testified to special conduct amounting to an admission, are relatives of plaintiffs. That is natural, since it is they who were most interested in the matter, and they who came into association with the deceased in the home. Naturally he would not broach the matter to uninterested parties, nor they to him. His open, notorious conduct, continuous during a period of nine years or more, uninterrupted by the birth of either of the plaintiffs, and ceasing only with his final illness, is evidence, not only of paternity, but of recognition; a willingness that all who observed should draw the natural conclusion from what he took no pains to conceal.

He did, no doubt, try to conceal the facts from his wife, but, according to the Kansas and Iowa decisions, we do not consider that as seriously damaging to the contention that the recognition was general and notorious.

One of the forgeries was a direct admission of paternity. It was a postscript to an authentic letter from the deceased to Mrs. Sanchez, translated: "I am anxious about my sons. Burn this letter." While this bit of evidence is of course to be rejected, the loss of it, as well as the affirmative fact of fraud, we consider as having a negligible bearing upon the case, for the reasons stated in discussing the forgeries in connection with the first point.

But if the matter be deemed doubtful so far, reasonable doubt ends if in March, 1927, the deceased directed or consented to the insertion of his name as father in the birth certificates of the plaintiffs. If it be considered that up to this time his policy had been one of general concealment, and only special recognition, by this act he abandoned it. The act is clearly calculated to give general notoriety, in the sense that any person having a legitimate reason to inquire is afforded a source of official, and apparently authentic, information. The fact is made matter of permanent record, which, in time at least, would become the only available evidence.

The mere fact that the State Board of Health may so regulate access to these records as to prevent improper use of the information, if known to the deceased, scarcely detracts from the effect of what he did. General and notorious recognition does not, we take it, require that the idly curious be gratuitously informed or furnished the means of information. As we said in the earlier opinion, "We cannot think of any act better calculated to give general and notorious recognition."

The witness Ida Garcia, subregistrar of births, testified that she interviewed the de-

ceased before making out the certificates and that she inserted his name with his consent and in his presence. Her husband corroborates her, saying that he was present.

There is nothing to detract from this except that Ida Garcia is the sister of Mrs. Sanchez; that she inserted the age of the deceased as 55 instead of 73; that she recorded his birth place as Punta instead of Tome, and used the letter "F" in designating "sex of child."

The last-mentioned error must have been inadvertent, as Mrs. Garcia knew the child's sex. From the other two it is easy to argue that the whole story was manufactured for the particular purpose. It may be argued with equal force that these errors are badges of good faith. If Mrs. Garcia had been engaged in perpetrating a fraud, she would have taken extra care to avoid telltale errors. They are as well, and perhaps better, explainable as mere mistakes. They have no connection with the main fact. As to that there can be no mistake. Either it is true, or both Mrs. Garcia and her husband are unmitigated perjurers. There is no sufficient reason for taking the latter view, and so we must take the former.

We thus conclude that the evidence preponderates in favor of the plaintiffs upon each of the essential ultimate facts. The judgment must accordingly be reversed. The cause will be remanded with a direction to the district court to render judgment for appellants. It is so ordered.

BICKLEY and ZINN, JJ., concur.

HUDSPETH, Justice (dissenting).

Plaintiffs' strongest piece of evidence, the written acknowledgment of paternity, has gone out as a forgery. In my opinion, the certificate of birth should also be eliminated. The contradictory and improbable testimony of Ida Garcia and her husband as to the authorization by the deceased of the insertion of his name in the certificate as the father of plaintiffs is in keeping with the evidence of fraud on the face of the certificate referred to in the majority opinion. Without these two pieces of evidence the case as to the recognition is exceedingly weak. The mother of plaintiffs testified:

"Q. Well, now he didn't say in that conversation, did he, that Julian was his child? A. Yes; he did.

"Q. He did? A. He did.

"Q. Well, who was present when he said that? A. He said it to me; there was no other person present.

"Q. Do you remember a single time during the ten years that you said Mr. Macario Torrez was coming to your place that anyone was present besides you and Mr. Torrez when he said that he was the father, that he was satisfied he was the father of these children, a single person, no. A. He said that. He told me that at the house. He wasn't going to tell me that in the presence of other people that might be there.

"Q. Yes, now isn't it a fact so far as you know that he never did tell any person except you that he claimed to be the father of those children? A. Yes, he did tell another person.

"Q. Were you present? A. No.

"Q. No? A. I wasn't present.

"Q. Then so far as you know he never told anyone so far as you personally know except to tell you. No. A. Other people I don't know, only to a first cousin of mine that he told."

This first cousin was brought three hundred miles to testify. Plaintiffs' mother's theory that there was a studied avoidance by the deceased of declarations of paternity is fully borne out by the record. Dr. Ottosen, the chief witness of plaintiffs other than relatives, who had known the deceased twenty-five years, as well as all other of plaintiffs' witnesses except relatives, admitted that the deceased had never acknowledged that he was the father of the boys in their presence or used any expression which might lead one to believe that he was their father. Plaintiffs' witness testified that the deceased was normally communicative. He had lived all his life in that vicinity and resided, with his wife, twelve miles from Willard. He never used a car. When he came to town he called on the mother of plaintiffs, whose male relatives, including a son, were employed by him as sheep herders.

Is it the province of this court to inquire why this old man, being treated for impotency, did not acknowledge the paternity of plaintiffs; or does the statute in words, the meaning of which is so well known that definition is unnecessary, confine the issue to an inquiry as to whether or not the deceased recognized plaintiffs as his children, and whether such recognition was "general and notorious"?

This legislation admitting illegitimate children to the right of succession is undoubtedly in derogation of the common law, and should be strictly construed. Cope v. Cope, 137 U. S. 682, 11 S. Ct. 222, 34 L. Ed. 832.

The conditions existing in this territory at the time of the enactment of the statute in 1889 were peculiar. See Reports of Attorney General on prosecutions under Edmonds-Tucker Act, 24 Stat. at Large, 635. Federal court records showed many prosecutions of men who had reared families without marrying the mothers of their children. They lived with these women openly and their recognition of their children was general and notorious. Comparatively few prosecutions against men with two or more women were brought in this territory. In 1887 the territorial Legislature enacted chapter 32 on descents, section 9 of which reads as follows: "The real and personal estate of any man dying intestate, without heirs resident in any of the United States at the time of his death, or legitimate children capable of inheriting without the United States, shall descend to, and be vested in his illegitimate child or children who are residents of this territory or any of the United States; and such illegitimate child or children shall be deemed and taken to be the heir or heirs of such intestate in the same manner and entitled to take by descent or distribution to the same effect and extent as if such child or children had been legitimate: Provided, That the intestate shall have acknowledged such child or children as his own during his lifetime: And provided further, That the testimony of the mother of such child or children

shall in no case be sufficient to establish the fact of such acknowledgment." The wife and mistress are not in the same category.

The whole history of legislation on this subject shows an appreciation of the institution of matrimony, as well as the danger of fraud and perjuries giving rise to abuses under these statutes. Is sufficient consideration being given to this policy? We lately reversed a trial court which held that a suit to quiet title was necessary where the rights of illegitimate children of testator, if any he had, had not been foreclosed. Montgomery v. First Mortgage Co., 38 N. M. 148, 29 P.(2d) 331. Many land titles, good on this theory, will become unmerchantable in fact if we hold that on such scant showing as was here made by relatives of the unmarried mother, "general and notorious" recognition of paternity can be established; and if fraud and forgeries, when exposed, are to be considered to have only "negligible bearing on the case." This jurisdiction will become the favorite field of operation of those engaged in building up cases against the rightful owners of estates.

I dissent.

SADLER, Justice (specially concurring in dissent).

I concur in the dissent of Mr. Justice HUDSPETH in his appraisement of the facts, but without the apprehension he entertains as to the effect of the decision on the merchantable quality of land titles unless the right of illegitimate children, if any, of testator, shall have been foreclosed in some appropriate manner. I do not consider the question arousing such apprehension to be involved as a general proposition on the record before us nor to have been decided by the majority opinion.

If plaintiffs fail to connect testator in some responsible way with the birth certificates, the certificates go out. When they go out, in my view, the plaintiffs' case fails on the facts. I place no reliance on the testimony that testator at the time in question abruptly reversed a policy of silence and concealment as to paternity of the plaintiffs maintained over a ten-year period and not only became willing to acknowledge their paternity but actually went seeking after the official, the subregistrar of births, before whom to make the most notorious official acknowledgment known to the law. The truth of whether he did so rests wholly upon the testimony of the subregistrar of births and her husband, sister, and brother-in-law, respectively, of the mother of plaintiffs. It fails to satisfy my mind of its verity.

### On Rehearing.

WATSON, Chief Justice.

On a rehearing, the cause has been again orally argued, particularly on the facts. The varying views of the justices remain as before. It has been contended that to warrant recovery in a case of this kind there should be more than a preponderance of evidence. Without deciding that question, the majority adhere to the former conclusion as supported by clear and convincing evidence.

It is now contended by appellees that the judgment must be affirmed for the reason

that the complaint will support none other. The point made is that 1929 Comp. St. § 154-112, vacating wills as to unmentioned children, does not apply in the case of illegitimate children.

If this proposition be sound, the complaint is incurably bad, and a judgment letting the illegitimate children in to share in the estate, contrary to the terms of the will, would be inherently and fundamentally erroneous. It would be such an error as it would be our duty to correct, even though never brought to the attention of the trial court, and brought to our attention only on motion for rehearing. This appellants admit.

But it is equally apparent that the proposition now advanced stared appellees in the face at the very outset. Orderly procedure and fairness to court and litigants required them to raise it by demurrer. If they are now right, much time and great expense have been consumed in two trials and two appeals in a controversy over facts which, if finally adjudged in appellants' favor, would not warrant any relief. Appellants contend that "the law of the case," as settled on the former appeal, requires an overruling of the contention appellees now make.

█ If "the law of the case" is established only by express pronouncement, as a minority of the courts hold (Annotation, 1 A. L. R. at page 733), there is nothing to appellants' contention. But, by great weight of authority, the doctrine applies in subsequent appeals to questions that "might have been, but were not, raised or presented on a prior appeal." 1 A. L. R. at page 725. And this

is well established as the rule in this state. Armijo v. Mt. Elec. Co., 11 N. M. 235, 67 P. 726; Davisson v. Citizens' Nat. Bank, 16 N. M. 689, 120 P. 304; State ex rel. Garcia v. Board of County Com'rs, 22 N. M. 562, 166 P. 906, 1 A. L. R. 720. It applies even to the contention here made that the complaint fails to state a cause of action. Arizona & C. R. Co. v. Denver & R. G. R. Co., 16 N. M. 281, 117 P. 730; Davisson v. Citizens' Nat. Bank, and State ex rel. Garcia v. Board of County Com'rs, supra. And we have frequently said that on the second appeal nothing was before the court for review except the proceedings subsequent to the first mandate. Davisson v. Citizens' Nat. Bank, supra; McBee v. O'Connell, 19 N. M. 565, 145 P. 123; State ex rel. Garcia v. Board of County Com'rs, supra.

█ In the case at bar, after they had answered the complaint and after appellants had replied, appellees filed a demurrer raising the fundamental question now urged. It seems never to have been brought on for ruling. The parties went to trial and appellants introduced their evidence and rested. Appellees then demurred to the evidence, and, among other grounds, specified, irregularly of course, that illegitimate children are not within the purview of 1929 Comp. St. § 154-112. The trial court sustained that demurrer on the single ground of the insufficiency of the evidence of general and notorious recognition. We reversed the resulting judgment, holding that such evidence was sufficient as against demurrer. The second trial was concerned with nothing but the facts of parentage and recognition. On the second appeal, addition-

al counsel for appellants having been recruited, there was included in the brief in chief a somewhat elaborate argument to demonstrate that illegitimate children are contemplated and embraced within the statute. This argument was ignored by appellees. They submitted the case on the single proposition that the facts as to parentage and recognition had been correctly found. On the decision of the second appeal, taking notice of the illness of appellees' counsel, we afforded unusual opportunity for a motion for rehearing and welcomed the appearance of new counsel, who now press the contention.

This recital demonstrates that the question we are now asked to decide has not been overlooked by appellees. It has either been held in reserve, or been abandoned as without merit. It has been waived if waiver is possible. Considering the fundamental nature of the question, the silence of the trial judge when it was presented to him, though irregularly presented, must be deemed an adverse ruling upon it. Our present appellate practice afforded appellees ample means to have it reviewed. N. M. App. Proc. Rule XV, § 2.

We have never been unmindful of the presence of this question at the very threshhold of the case. We have been at pains so to frame our opinions as not to establish precedent. But, for this particular case, we have accepted the law to be as manifestly acquiesced in by counsel. For purposes of this case there has been "necessarily involved" in both of our opinions a holding adverse to the contention now made. Cf. U.

S. v. Denver & R. G. R. Co., 11 N. M. 145, 66 P. 550.

The recital demonstrates also that, having in mind the necessities for orderly procedure and for an end of litigation, every reason here exists for applying the doctrine of "the law of the case." It demonstrates that appellees have had their day in court.

■ It is to be regretted that there will remain open a question which, if presented sooner, might have led to a different result. The doctrine presupposes that very thing. "Right or wrong," the "law of the case" is controlling, as we have often expressed it. U. S. v. Denver & R. G. R. Co.; McBee v. O'Connell; Davisson v. Citizens' Nat. Bank, supra; Dye v. Crary, 13 N. M. 439, 85 P. 1038, 9 L. R. A. (N. S.) 1136. And see First Nat. Bank v. Cavin, 28 N. M. 468, 214 P. 325; Farmers' State Bank v. Clayton Nat. Bank, 31 N. M. 344, 245 P. 543, 46 A. L. R. 952.

In Farmers' State Bank v. Clayton Nat. Bank, 31 N. M. 344, 245 P. 543, 46 A. L. R. 952, while refusing to extend the doctrine to what was not technically a subsequent appeal, and while referring to what a writer had characterized as "a considerable tendency, and probably a growing one," to except from the doctrine a decision "clearly erroneous," we recognized the rule as so well established here that if the case then before us had been a subsequent appeal, we would have been bound by the former decision. There we briefly summarized the reasons for and against the doctrine.

■ Citing a few of the decisions from the annotation mentioned in the case last mentioned (1 A. L. R. 1267), appellees urge that the rule is not inflexible nor invariable, and that it is within our discretion to apply it or not. We have the power, no doubt, to vary the doctrine. But, as we conceive, it is not only the part of wisdom, but a high duty, to pursue a consistent course. If considerations of justice in the particular case are to be paramount, there is no room for "the law of the case." If we are here deterred by the fear that what we have heretofore assumed, and what is necessarily involved in what we have heretofore decided, may be wrong, we abolish the doctrine itself.

This case does not present that feature which gave concern to the courts whose decisions are collected in the note just mentioned. What we here hold to be "the law of the case" is not "clearly erroneous." The scope of the argument; the voluminous briefs, aggregating nearly 500 pages; the confidence each of the able counsel manifests in the soundness of his contention—all show that the question is a close one.

■ Pointing out that counsel for appellants argued the question in their brief in chief on the second appeal, as already noted, appellees suggest that they invited full consideration of it and waived "the law of the case." Appellants did no doubt anticipate the present contention and invite appellees to present it. If the invitation had been accepted, it would have been a waiver of the point in so far as it was theirs to waive. If that waiver would have warranted the court in entertaining the proposition at that time, it does not follow that it warrants us in entertaining it now, after appellees have passed up the invitation and the opportunity, and have speculated upon their chances of winning otherwise.

We accordingly adhere to our former respective opinions, and to the original disposition of the appeal.

SADLER, HUDSPETH, BICKLEY, and ZINN, JJ., concur.