489 A.2d 41

**Verla Cannon HALL, et al.**

v.

**Willie Clagett COATES, Personal Representative of the Estate of Ernest Wesley Coates.**

No. 869, Sept. Term, 1984.

Court of Special Appeals of Maryland.

March 12, 1985.

Martin C. Dennis, Dunkirk, for appellants.

Jack G. Upton, Prince Frederick (Daniel P. Sheridan and Rymer & Sheridan, Prince Frederick, on brief), for appellee.

Argued before BISHOP, ADKINS and ROSALYN B. BELL, JJ.

ADKINS, Judge.

The Orphans' Court for Calvert County, through administrative probate, appointed appellee, Willie Clagett Coates, personal representative of the Estate of Ernest Wesley Coates. The basis of the appointment was appellee's assertion that he was the only surviving son of the decedent. Appellants, Verla Cannon Hall and others, petitioned for judicial probate, alleging that Ernest Coates had died testate and that appellee was not Ernest's son. In addition to judicial probate, they sought removal of appellee as personal representative and appointment of Verla Hall in that capacity. Appellee answered the petition. He denied that Ernest had left a will. He rejected the allegation that he was not Ernest's son. He joined appellants in their prayer for judicial probate, asking that the court find him to be Ernest's legitimated son and name him as personal representative of Ernest's estate.

A hearing was had in the Orphans' Court for Calvert County. There appellants argued that appellee was not the son of Ernest Wesley Coates. More specifically, they contended that appellee was, at best, an illegitimate son of the decedent, who had never been legitimated by virtue of the decedent's open and notorious recognition of him as his child. Estates and Trusts Article § 1–208(b)(3). The orphans' court saw the matter otherwise. By order dated June 26, 1984, it found that "Ernest Wesley Coates ... on many occasions ... openly acknowledged Willie Coates as his son...." It "determined" appellee "Willie Coates ... to be the son of Ernest Wesley Coates, deceased."

Appellants now attack this determination as being erroneous both in law and in fact. But before we reach those questions, we must address a threshold issue: that of the jurisdiction of this court to hear the appeal.

### Jurisdiction

Section 12–501 of the Courts and Judicial Proceedings Article permits "[a] party [to] appeal to the Court of Special

Appeals from a final judgment of an orphans' court." That language is the product of code revision and was adopted by Ch. 2, Acts of 1973 (1st special session). Chapter 2 also repealed various provisions of former Article 5 of the Code, including those that dealt with appeals from orphans' court. *Wall v. Heller*, 61 Md.App. 314, 324, 486 A.2d 764 (1984). The adoption of § 12–501 was not intended, however, to alter prior substantive law in this area. *See Wall*, [61 Md.] at 324, 486 A.2d 764. *See also* Ch. 2, Acts of 1973 (1st special session) Revisor's Note at 369 ("[t]his section combined §§ 9 and 10 of Art. 5, giving effect to recent legislation regarding appellate jurisdiction. The only changes made are in style"). Specifically, § 12–601 carried forward, without substantive change, the earlier language of Article 5, § 9 (1968 Repl.Vol.) (repealed 1973). *Schlossberg v. Schlossberg*, 275 Md. 600, 611–12, 343 A.2d 234 (1975). That language has been interpreted as providing "that the appeals shall be taken only from *final* orders or decisions [of orphans' courts], those actually settling the rights of the parties." *Collins v. Cambridge Maryland Hospital, Inc.*, 158 Md. 112, 116, 148 A. 114 (1930) [emphasis supplied]; 1 P. Sykes, *Maryland Practice: Probate Law and Practice* § 244 (1956). P. Sykes, *Contest of Wills* § 154 (1941).

In *Langhirt v. Hicks*, 153 Md. 31, 137 A. 482 (1927), the issue before the orphans' court was whether Hicks was estopped from caveating a will. The orphans' court passed an order to the effect that she was not estopped and was entitled to have issues transmitted to a court of law. The orphans' court did not, however, direct that the issues be transmitted. The Court of Appeals dismissed Langhirt's appeal from that order. It reasoned: "The order passed was nothing more, in effect, than the opinion of the [orphans'] court." 153 Md. at 34, 137 A. 482. That is precisely the situation we have before us.

Section 5–404(a) of the Estates and Trusts Article provides that:

A hearing for judicial probate is a plenary proceeding.... [The court] shall adjudicate the issues raised in

the hearing and shall determine the testamentary capacity of the decedent if he died testate. After the hearing the court shall appoint one or more personal representatives and shall, if appropriate, revoke, modify, or confirm action taken at the administrative ... probate.

■ In the order here appealed, the Orphans' Court for Calvert County did not make any determination of testamentary capacity. It did not appoint a personal representative. It did not "revoke, modify, or confirm action taken at the administrative ... probate." It did not grant or dismiss the petition for judicial probate. It merely made a finding of fact: that appellee was the son of Ernest Coates. This finding of fact was a critical one, but the "order" announcing it was no more than an opinion of the orphans' court; it was not an appealable order. *Langhirt* and *Collins, supra.* *See also Schlossberg,* 275 Md. at 615, 348 A.2d 234 (appeal dismissed because there was no final "judicial determination that the administrative probate granted the appellant should be set aside").

That being the case, we have no jurisdiction over the appeal and must dismiss it. Nevertheless, as the Court of Appeals did in *Schlossberg* and *Langhirt,* we shall "set forth 'what our decision would be if the case were properly before us' since inevitably," upon passage of an appropriate order by the orphans' court, the issues presented by appellants would return to haunt us by way of a second appeal. *Schlossberg,* 275 Md. at 616, 343 A.2d 234 (quoting *Langhirt,* 153 Md. at 34, 137 A. 482).

*Legitimation—Open and Notorious Recognition*

Section 1-208(b) of the Estates and Trusts Article provides:

A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of the father only if the father

(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings; or

(2) Has acknowledged himself, in writing, to be the father; or

(3) Has openly and notoriously recognized the child to be his child; or

(4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father.

There is no contention in this case that appellee's mother was ever married to Ernest Coates. Nor is there any attempt to invoke paragraph (1) or (2). The only claim for legitimation is asserted under § 1–208(b)(3).

As we have seen, the orphans' court decided that the evidence produced before it demonstrated that the requirements of § 1–208(b)(3) had been met. Before turning to the facts presented below, we shall consider the legal issue: What showing does § 1–208(b)(3) require to meet its open and notorious recognition standard?

Section 1–208(b)(3)'s open and notorious recognition requirement, as a prerequisite to legitimation by a father, must be viewed in the context of the problem the statute and its predecessors attempted to address. That problem was the status of a bastard at common law.

At common law an illegitimate child was regarded as *filius nullius* or *filius populi* and was deemed to be without parents or kindred. 1 P. Sykes, *supra,* § 162. As a consequence, the illegitimate could not inherit from its father. Note, *Inheritance By And From Illegitimates Under Maryland Intestacy Law,* 20 Md.L.Rev. 276 (1960).[1] This harsh policy was supported by arguments that it discouraged fraudulent claims and that it punished wrongdoing. *Id.* at 279. As to the latter reason, at least, it came

---

1. The author of this note was Daniel W. Moylan, now a judge of the Circuit Court for Washington County.

to be recognized that the punishment was inflicted on the innocent child, not on the erring parents. *Id.* As a consequence, legislatures acted "to remove the taint and disabilities of bastardy from the unoffending children" on "the principle that it is unjust to punish the offspring for the crime of the parents." *Dilworth v. Dilworth,* 134 Md. 589, 591, 108 A. 165 (1919). *See also Hawbecker v. Hawbecker,* 43 Md. 516, 520 (1876).

An early Maryland step in this direction was the adoption of Ch. 45, § 7, Acts of 1786, re-enacted as Ch. 191, Laws of 1820, § 7. As later codified in Art. 46, § 6, this provided:

> If any man shall have a child by any woman whom he shall afterwards marry, such child ..., if acknowledged by the man, shall, in virtue of such marriage and acknowledgment, be hereby legitimated and capable in law to inherit and transmit in inheritance as if born in wedlock.

A much more extensive step was taken in 1969. By Chapter 3 of the Acts of that year, the General Assembly adopted "a comprehensive restatement of the testamentary laws of Maryland...." *Second Report of the Governor's Commission to Review and Revise The Testamentary Law of Maryland,* i (1968). A part of that revision was enacted as Art. 93, § 1–208—the provision that now appears, without substantive change, as § 1–208 of the Estates and Trusts Article. Former Art. 46, § 6, is included as § 1–208(b)(4). But § 1–208, as is apparent, went well beyond Art. 46, § 6. As the Commission observed:

> This Section also spells out more fully the procedure for legitimation by acknowledgment without a subsequent marriage as is now required by Maryland law. It reflects the modern policy in the direction of mitigating the impact of illegitimacy.

*Second Report* at 9. *See also Dawson v. Eversberg,* 257 Md. 308, 314–15, 262 A.2d 729 (1970). It is, of course, that

"procedure for legitimation by acknowledgment without a subsequent marriage" with which we are now concerned.[2]

The legislative history we have traced clearly manifests substantial abandonment of the notion that an illegitimate child should be punished because it occupies that status. On the other hand, the other basis for the harsh common-law policy—protection against fraudulent claims—has not been rejected totally. Each of the four legitimation conditions of § 1–208(b) is a safeguard against false claims of parenthood because each requires some formal or informal action to establish paternity—in each case an action in which the purported father must be involved. With the exception of paragraph (1) of subsection (b) (judicial determination), the statute requires some form of acknowledgment by the father; an acknowledgment that can be proven, it would seem, from some source or sources other than the putative child. Paragraph (3), upon which we focus, makes that apparent because it demands an open and notorious recognition of parenthood by the father. The question is just how open and notorious that recognition must be. As we address this question, we keep in mind that § 1–208(b), as a legitimation statute, is to be liberally interpreted. *Thomas v. Solis, supra,* 263 Md. at 542, 283 A.2d 777. *And see Penman v. Ayers,* 221 Md. 154, 162, 156 A.2d 638 (1959).

The few reported Maryland decisions are of little help in determining the full extent of the requirement. *Dilworth v. Dilworth, supra,* for example, involved former Art. 46, § 6 and thus a requirement of acknowledgment of parenthood by the father. It appears that after the father and mother were married, the father acknowledged the child

---

**2.** In the context of this case it is worth noting that § 1–208 does more than establish the right of an illegitimate child to inherit where one or more of the statutory conditions are met. As a legitimation statute, *Thomas v. Solis,* 263 Md. 536, 542, 283 A.2d 777 (1971), if one or more of its conditions are met, it brings a legitimated child within § 1–205's definition of "child." *Compare* Art. 1, § 16. In addition, if one or more of these conditions are met, it places a legitimated child on a par with a legitimate child so far as appointment as personal representative under § 5–104 is concerned.

was his and the child was "raised and treated in the family as their legitimate offspring." 134 Md. at 590, 108 A. 165. That was held to be sufficient. *See also Holloway v. Safe Deposit & Trust Co.*, 151 Md. 321, 134 A. 497 (1926) (raising child as member of family sufficient acknowledgment to legitimate under Art. 46, § 6), *appeal dismissed*, 274 U.S. 724, 47 S.Ct. 762, 71 L.Ed. 1329 (1927). These cases establish no more than the rather self-evident proposition that when the parents of an illegitimate child marry and raise the child as a member of their family, the treatment of the child in such a manner constitute an adequate acknowledgment of paternity.[3] The same provision (then codified as Art. 93, § 1–208(4), identical to what is now § 1–208(b)(4) of the Estates and Trusts Art.) was held to be satisfied when the father acknowledged his paternity in court pleadings and testimony. *Williams v. Williams*, 18 Md.App. 353, 356–57, 306 A.2d 564 (1973), *overruled on other grounds, Powley v. Owens*, 49 Md.App. 349, 431 A.2d 749 (1981).

In *Skeens v. Paterno*, 60 Md.App. 48, 58, 480 A.2d 820 (1984), we similarly held that an acknowledgment of paternity in pleadings was sufficient for the purposes of § 1–208(b)(2) of the Estates and Trusts Art. (father's written acknowledgment of paternity). There was a like conclusion in *Thomas v. Solis, supra.* More to the point, *Thomas* concluded that an acknowledgment in pleadings also satisfied the open and notorious recognition requirement of § 1–208(b)(3). 263 Md. at 544, 283 A.2d 777.

What, less than raising as a family member or acknowledgment of paternity in pleadings, will suffice as recognition? We dealt with that question in *Harris v. Brinkley*, 33 Md.App. 508, 365 A.2d 304 (1976), a case involving a posthumous illegitimate child. Without discussion of the precise meaning of the "openly and notoriously recognized" lan-

---

3. It is equally clear that a father who co-habitates with the mother and helps her rear the children has also openly and notoriously recognized the children. *Thomas,* 263 Md. at 544, 283 A.2d 777; *Dawson,* 257 Md. at 315, 262 A.2d 729.

guage of § 1–208(b)(3), we noted that the father (before the child's birth) had told several persons "that Mrs. Hamlin [the mother, who was unmarried to the father] was pregnant with his child." 33 Md.App. at 511, 365 A.2d 304. We concluded that § 1–208(b)(3) had been satisfied because "the testimony was to the effect that the deceased [father] was proud that Mrs. Hamlin was pregnant with his child and withheld that fact from no one." *Id.* at 514, 365 A.2d 304. Of like purport is *Davis by Lane v. Schweiker,* 553 F.Supp. 158 (D.Md.1982). That case, like *Montgomery v. Schweiker, infra,* involved a child's claim for social security dependency benefits, a claim depending upon the legitimate or legitimated status of the child. Applying Maryland law, the United States District Court held that § 1–208(b)(3) was satisfied because the father "had told friends, family and co-workers that" the claimant was his child and "told everyone" that the child was his son. In addition, there was evidence that the father, mother, and child had all lived together as a family. 553 F.Supp. at 159, 162.

Do these cases instruct that "withholding [the] fact [paternity] from no one" (*Harris*) or telling "everybody" (*Davis*) is a *sine qua non* of open and notorious recognition? We think not. In *Montgomery v. Schweiker,* 523 F.Supp. 1128 (D.Md.1981), for instance, the United States District Court found sufficient the testimony of "several people" that a father had "publicly acknowledged" a child as his daughter, despite the fact that other witnesses were unaware of the acknowledgments. 523 F.Supp. at 1134.

Cases from other jurisdictions, with generally similar fact patterns, have reached the same result. *See, e.g., In Re Wulf's Estate,* 242 Iowa 1012, 48 N.W.2d 890 (1951), *Tout v. Woodin,* 157 Iowa 518, 137 N.W. 1001 (1912) and *Sanchez v. Torres,* 38 N.M. 556, 37 P.2d 805 (1934). In each of these cases the pertinent statute required the father's general

and notorious recognition of the illegitimate child.[4] To gratify that condition the recognition "need not be 'universal or so general and public as to have been known by all' " and need not be continuous, *e.g.*, from the birth of the child to the death of the father. *Wulf*, 48 N.W.2d at 894. The father need not advertise his paternity. It is enough if he makes no attempt to conceal the fact when the subject arises. *Tout*, 137 N.W. at 1002–03.

The holdings of these cases may be applied to § 1–208(b)(3). Although Iowa and New Mexico law speaks in terms of "general and notorious recognition," while Maryland requires that the father "[h]as openly and notoriously recognized" the child as his, we discern no material difference. "Open" is defined as "visible; apparent; notorious; not clandestine." *Black's Law Dictionary* (Rev. 4th ed. 1968). "Notorious" while it may mean "universally recognized" also denotes "... [o]pen; generally or commonly known and spoken of." *Id.*[5] When we consider these words in the context of the fraud-preventing purpose of the statute, we think they should be read as the equivalent of the "general and notorious" language used in other states. The underlying purpose is essentially the same. That purpose is to guard against false paternity claims, such as those made after the putative father is dead, and thus no longer able to give his own version of matters. That purpose is accomplished when there is evidence sufficient to support a finding that the father admitted his paternity, not necessarily to all the world, but to appropriate people under appropriate circumstances. The testimony of the recipients of this information, if the testimony is believed, provides a

---

4. Many of the cases are collected at *Annot.* 33 A.L.R.2d 705, 733–36 (1954).

5. We cite the 1968 edition of *Black* because its publication was roughly contemporaneous with the *Second Report of the Governor's Commission to Review and Revise the Testamentary Law of Maryland, supra.* As we have seen, it was via the legislative adoption of the recommendations of this *Report* that the "openly and notoriously" language first entered the legitimacy law of Maryland.

sufficient safeguard against fraud. It was in this fashion that the orphans' court in effect construed the Maryland law. We hold its construction was correct.

## The Facts of This Case

We now consider the application of § 1–208(b)(3) to the facts of this case. In doing so we keep in mind that this is an appeal directly from the orphans' court to this court. Courts and Judicial Proceedings Art. § 12–501. In such an appeal, "the findings of the Orphans' Court are entitled to a presumption of correctness." *New York State Library School Association, Inc. v. Atwater*, 227 Md. 155, 157, 175 A.2d 592 (1961). As in other reviews of trial court fact finding, the credibility of witnesses is for the trial court. We will not set aside findings of fact unless they are clearly erroneous. *Harris, supra,* 33 Md.App. at 514, 365 A.2d 304.

The record contains evidence from which a fact-finder could determine that appellee, William Clagett Coates, was the illegitimate son of Ernest Coates and a woman named Mabel Jones or Mabel Clagett. Appellee was born in 1926. Ernest Coates, a long-time resident of Calvert County, died in 1983. During many of the intervening years, appellee was absent from Calvert County. There was evidence that appellee visited Ernest from time to time and cared for him in his last illness. There was no evidence that appellee ever lived with Ernest Coates as part of the latter's family, nor was there evidence that Ernest had acknowledged in writing that appellee was his son. There was no evidence of any judicial determination of paternity. But there was testimony, from Walter Johnson, a stepson of Ernest's, that Ernest, as early as 1966, had introduced appellee as Ernest's son. Stepdaughters Carrie Taylor and Elizabeth Hawkins testified that Ernest had acknowledged appellee to be his son on more than one occasion. These were individuals to whom it was natural that such statements would be made; the statements were made under circumstances suggesting no motive for falsification; they were made to

people who had had a lengthy and close association with Ernest.

To be sure, those introductions and acknowledgments were made in Ernest's home, to relatives, and in comparative privacy. But they were not made in secrecy or under any claim of confidentiality. They were made under circumstances suggesting no intent to conceal paternity, but rather to reveal it in an appropriate manner. Ernest's recognition of appellee as his son was not limited to family members,[6] for he acknowledged paternity to Gladys Kent, a neighbor, and to Rowland Morsell, a life-long friend. The statement made to Morsell, moreover, was made outside Ernest's home.

There was, in addition, evidence that after the death of Ernest's daughter, Lillian Coates Myers, appellee was listed as Ernest's son in a church funeral bulletin—one that had been prepared with Ernest's participation and in part under his direction. *See Sanchez, supra,* 37 P.2d at 808–09 (father consented to insertion of his name on illegitimate son's birth certificate). Appellee was also listed as Ernest's son in a church bulletin prepared following Ernest's death. Obviously, Ernest played no part in the preparation of that document, but this statement of appellee's status could be considered as a reflection of what was common knowledge in the community, as could the fact that after Ernest's burial, appellee was given the flag that had draped the dead veteran's casket. There was additional evidence of community repute. Elizabeth Hawkins testified that "everybody, you know, that lived around here knew that [appellee was Ernest's son]." *See also* the testimony of Walter Johnson and Gladys Kent. Evidence of community knowledge or general repute is not conclusive on the question of open and notorious recognition, but it is competent and admissible.

---

**6.** There was also evidence in the record from which it could be inferred that Ernest Coates introduced Willie as his son at a family reunion.

*Wulf, supra,* 48 N.W.2d at 893. *See also Morgan v. Strand,* 133 Iowa 299, 110 N.W. 596, 597 (1907).

There was, of course, contradictory testimony. Some of appellant's witnesses testified that Ernest denied having had a son. Others said they had never heard Ernest admit to having a son. Conflicts of this sort are not unusual in "open and notorious" recognition cases. *See Shelley v. Smith,* 249 Md. 619, 633, 241 A.2d 682 (1968). But the credibility of the witnesses and the weight to be given the evidence on each side of the issue is primarily for the trier of fact. *See Harris, Montgomery, Wulf, Tout, Morgan,* and *Sanchez,* all *supra.*

In the record before us there was evidence to support a finding that Ernest Coates had "openly and notoriously recognized" appellee to be his son. We cannot say that the Orphans' Court for Calvert County was clearly erroneous in deciding that he had, and in concluding that "Willie Coates is ... the [legitimated] son of Ernest Wesley Coates, deceased."

APPEAL DISMISSED. APPELLANTS TO PAY THE COSTS.