10 N.J. Super. 152 (1950)
76 A.2d 717
MARY CORTESE, PLAINTIFF-RESPONDENT,
v.
VITO CORTESE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 6, 1950.
Decided November 15, 1950.
*155 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. Lawrence Friedman argued the cause for appellant (Mr. Philip Insabella, attorney).
Mr. G. Dixon Speakman argued the cause for respondent (Mr. William R. Vanderbilt on the brief).
The opinion of the court was delivered by WILLIAM J. BRENNAN, JR., J.A.D.
The Essex County Juvenile and Domestic Relations Court ordered defendant to pay his wife, the plaintiff, a sum weekly for the support of herself and an infant child born less than five months after their marriage, and denied defendant's application for a blood test under R.S. 2:99-4. The wife admitted pre-marital sexual relations within the probable limits of conception with both the defendant and another and acknowledged her uncertainty as to the child's paternity. She refused to submit herself and the child to a blood test. She claimed she told defendant before their engagement on June 28, 1947, when about two months pregnant, of her uncertainty whether he or the other, a married man, was the father of the child to be born and that, nevertheless, he agreed to marry her. Defendant denied having knowledge of her relations with anyone except himself until 15 months after the child's birth when he says she taunted him during a dispute at their home that he was not the child's father, and he left her.
This is a civil action, plaintiff's complaint being for "adequate support" under P.L. 1946, c. 77, § 2, amending R.S. 9:18-14. Frank v. Juvenile & Domestic Relations Court of Essex County, 137 N.J.L. 364 (Sup. Ct. 1948); Lasasso v. Lasasso, 1 N.J. 324 (1949).
*156 The question presented by defendant's appeal is whether the denial of defendant's motion for an order compelling a blood grouping test was a proper exercise of judicial discretion in the circumstances.
The trial court was empowered under R.S. 2:99-4 to order the requested test. The statute provides:
"Whenever it shall be relevant in a civil action to determine the parentage or the identity of any child or other person, the court, by order, may direct that any party to the action and the person whose parentage or identity is involved submit to one or more blood grouping tests, to be made by duly qualified physicians under such restrictions and directions as the court or judge shall deem proper. Whenever such test is ordered and made, the testimony of the experts to the results thereof, subject to cross examination as in section one, shall be receivable in evidence, but only in cases where definite exclusion is indicated. The order for such blood grouping tests also may direct that the testimony of such experts and of the persons so to be examined be taken by deposition. The court shall determine how and by whom the costs of such examinations shall be paid."
The source of the section is P.L. 1939, c. 221, § 2. The first section of that statute, now R.S. 2:99-3, is applicable to criminal and quasi-criminal proceedings, for example, bastardy and filiation cases. The second section, with which we are concerned here, is applicable to civil causes in which it is relevant to determine the parentage or identity of any child or person.
The statute relates to the obtaining of evidence in the field of contested paternity where the truth is so often obscured because social pressures create a conspiracy of silence or, worse, induce deliberate falsity.
The value of blood tests as a wholesome aid in the quest for truth in the administration of justice in these matters cannot be gainsaid in this day. Their reliability as an indicator of the truth has been fully established. The substantial weight of medical and legal authority attests their accuracy, not to prove paternity, and not always to disprove it, but "they can disprove it conclusively in a great many cases provided they are administered by specially qualified experts," Beach v. Beach, 114 F.2d 480 (D.C. Cir. 1940), and see *157 Annotation, 163 A.L.R. 923; Jordan v. Mace, ___ Me. ___, 69 A.2d 670 (Sup. Jud. Ct. 1949); Report, Committee on Medicolegal Blood-grouping Tests, 108 Am. Med. Ass'n. Journal, 2138-2142 (June, 1937). A wealth of medical, scientific and legal references will be found in Schatkin, Disputed Paternity Proceedings (2d Ed. 1947), p. 184; Wigmore on Evidence, vol. I, § 165a et seq. (3d Ed. 1940). Blood tests can now disprove paternity in over one-half of the paternity cases involving innocent men. 63 Harvard Law Review 1271 (May, 1950).
It is plain we should hold, as we do, that this unanimity of respected authorities justifies our taking judicial notice of the general recognition of the accuracy and value of the tests when properly performed by persons skilled in giving them. The law does not hesitate to adopt scientific aids to the discovery of truth which have achieved such recognition. Cf. State v. Cerciello, 86 N.J.L. 309, at 314 (E. & A. 1914), where the admissibility in evidence of finger prints, now universally acknowledged to be virtually dispositive of issues of identity, was first approved in the State by our highest court on "* * * the theory that the evolution in practical affairs of life, whereby the progressive and scientific tendencies of the age are manifest in every other department of human endeavor, cannot be ignored in legal procedure, but that the law in its efforts to enforce justice by demonstrating a fact in issue, will allow evidence of those scientific processes, which are the work of educated and skillful men in their various departments and apply them to the demonstration of a fact * * *."
We do not, unfortunately, have the benefit of the reasons upon which the trial court based its denial of defendant's motion. In the light of the wide acceptance of the value of the tests and the legislative recognition implicit in the statute of their competency to help the courts in the search for truth, we think only reasons of considerable force should move a court in a civil case to deny a motion for an order to compel a blood test when, as in this case, the issue of parentage is *158 relevant and, it may be, crucial, in the disposition of the matter.
Plaintiff argues in support of the trial court's action that the ordering of the tests is discretionary with the trial court under the terms of the statute. This is true, but judicial discretion is not an arbitrary or personal discretion to be exercised according to the whim or caprice of the individual judge; it is a mere legal discretion and he should use the authority reposed in him when the essential requisites for its exercise exist and the justice of the course is apparent. McFeely v. Board of Pension Commissioners of Hoboken, 1 N.J. 212, at 215 (1948). We are empowered to review his action and to reverse it when it appears his judicial discretion was not properly exercised in the circumstances, and it also appears the error injuriously affected the substantial rights of a party. State v. Hunter, 4 N.J. Super. 531, at 535 (App. Div. 1949); cf. Rules 1:2-20 and 3:81-13.
It has been said the word "may" shall be taken "to be mandatory, when the thing to be done is for the sake of Justice, or the public good," Davison et al. v. Davison's Adm'r., 17 N.J.L. 169 (Sup. Ct. 1839). We do not go so far in construing this statute. Proof that the giving of the test would endanger the health of a person submitting to it necessarily would be a proper reason for exercising discretion to deny an order to compel such person to take the test, although the giving of a few drops of blood can rarely in the light of medical experience have that consequence and the burden of proof to show that probability in a given case should be on the person making the assertion. Too, if, on proper proofs, the court entertains doubts whether this highly technical test can be adequately performed by competent and qualified technicians, Article, Schatkin & Levine, "Paternity Blood Tests," 62 N.J.L.J. 341 (October 5, 1939), cf. State v. Hunter supra, it could hardly be suggested the court had exceeded the limits of permissible judicial discretion in denying an order to compel the taking of the tests. In the absence of these or other like special circumstances, however, we think *159 the demonstrated utility of this tool of evidence should move trial courts in civil actions to employ it freely.
We perceive no valid reason why, standing alone, the refusal of this plaintiff to submit voluntarily to the tests justifies, as she suggests, the denial of an order to compel her to do so when such test will or may materially assist in determining the right of the matter. "The citizen holds his citizenship subject to the duty to furnish to the courts, from time to time and within reasonable limits, such assistance as the courts may demand of him in their effort to ascertain truth in controversies before them." State v. Damm, 64 S.D. 309, 266 N.W. 667 (1936) (affirming on rehearing (1933) 62 S.D. 123, 252 N.W. 7). This is a truism particularly apt to a litigant who like this plaintiff invokes the judicial process in her own behalf.
Plaintiff argues the statute implies she may not be ordered to submit to the tests if she refuses to do so. This is not so. True, the first section of the statute, applicable to criminal and quasi-criminal proceedings, has language which may arguably imply a privilege of declination. This is the last sentence, reading "Whenever the court orders such blood grouping tests to be taken and one of the persons thus directed shall refuse to submit to such tests, such fact shall be disclosed upon the trial in the discretion of the court." We are not called upon in this civil case to express an opinion whether the courts may require the defendant in a criminal case to submit to a blood test and furnish blood for such purpose. Even assuming a person in a criminal case is privileged by force of the quoted sentence to refuse to submit to a test, such privilege cannot be successfully claimed by a person concerned in a civil action because no like provision implying the privilege appears in the second section applicable to civil cases. This omission cannot have been accidental; it is presumed to have been a matter of legislative design. It is apparent the omission reflects a legislative intent that in civil actions the trial court in a proper case shall have authority to order the tests despite a refusal voluntarily to submit, and, *160 as a necessary corollary, to enforce obedience to such order by appropriate and familiar judicial sanctions. Cf. Rule 3:37-2(b); Bissell v. Bissell, 93 N.J. Eq. 537 (Ch. 1922); and see R.S. 9:18-30.
Plaintiff at the oral argument withdrew the contention in her brief that the statute, if construed to empower the trial court to issue and enforce a compulsory order, would be unconstitutional as an invasion of the right of personal privacy in violation of Article I, paragraph 1, of the State Constitution. We, nevertheless, state our view because of the conflict of decisions on the question in Bednarik v. Bednarik, 18 N.J. Misc. 633 (Ch. 1940) and Anthony v. Anthony, 9 N.J. Super. 411 (Ch. Div. 1950). We hold the statute as interpreted here is not unconstitutional; the contrary holding in the Bednarik case is expressly disapproved.
Plaintiff's final contention is that the denial of the compulsory order was in any event proper because even test results disproving defendant's paternity would not suffice to overcome the potency of the presumption of legitimacy. That presumption, however, may be rebutted. Justice Swayze said in Wallace v. Wallace, 73 N.J. Eq. 403 (E. & A. 1907), "* * * this presumption may be overcome * * *." Chief Justice Gummere expressed it, "that issue born of that marriage is prima facie legitimate," Vreeland v. Vreeland, 78 N.J. Eq. 256 at 261 (E. & A. 1910).
Plaintiff's argument actually goes to the question whether the statutory language making a result disproving paternity "receivable in evidence" is to be interpreted to treat the result as merely a form of expert evidence not necessarily barring a finding of paternity contrary to the test result, Berry v. Chaplin, 74 Cal. App.2d 652, 169 P.2d 442 (1946); cf. State v. Cerciello, supra, or is to be deemed conclusive evidence of non-paternity routing the presumption of legitimacy, 163 A.L.R. 959, see Jordan v. Mace, supra.
The differing views are discussed in Schatkin, Disputed Paternity Proceedings, supra, who at p. 184, reveals his own preference: "As far as the accuracy, reliability, dependability *161  even infallibility  of the test are concerned, there is no longer any controversy. The result of the test is universally accepted by distinguished scientific and medical authority. There is, in fact, no living authority of repute, medical or legal, who may be cited adversely. Furthermore, that the weight of enlightened legal authority is in favor of according decisive evidentiary effect to reliably reported blood test exclusions, is shown by the favorable comment on instances of judicial acceptance of exclusions, and the critical, deprecatory view of judicial disregard of conclusions, which have appeared in law reviews throughout the country;" and see Articles, 124 New York Law Journal, 12, 20 (July 5 and 6, 1950).
We are not called upon to resolve this question at this time. The issue can arise only when and if a blood test is made and the result excludes defendant's paternity. It is sufficient we hold the interests of justice require the trial court to reconsider defendant's motion in light of our opinion to the end that valuable evidence relevant to the case may not be overlooked if it may be obtained in a manner consistent with the rights of the parties and of the child through blood tests properly performed.
Reversed. No costs.