607 A.2d 935

**William TURNER**

v.

**Kelly A. WHISTED, et al.**

**No. 52, Sept. Term, 1991.**

Court of Appeals of Maryland.

June 22, 1992.

Brian S. Brown, argued and on brief (D'Alesandro, Miliman & Yerman, on brief), Baltimore, for petitioner.

Frederick J. Hatem, Jr., argued and on brief (Dewey Brian Stanley Reed, Feinberg & Hatem, on brief), Bel Air, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

On March 8, 1986, Kelly Whisted (Kelly) gave birth to a son and named him Jeffrey. Approximately five and a half months prior to Jeffrey's birth, Kelly married Danny Whisted (Danny). Before her marriage, Kelly was also involved in a relationship with William Turner (Turner). Jeffrey was conceived during the time Kelly was seeing Turner, and Kelly, on at least two occasions, wrote to Turner that he was her child's father. Despite these letters, Jeffrey was given the Whisted name and Danny Whisted was listed as father on Jeffrey's birth certificate. Six months after Jeffrey was born, Kelly left her husband and renewed her relationship with Turner. Despite the separation, Danny continued to visit Jeffrey on a regular basis and to pay support for his care and maintenance.

The relationship between Kelly and Turner continued for eighteen months, during which time Turner appears to have developed a relationship with Jeffrey. When Kelly and Turner broke up once again, Turner's contact with Jeffrey ended. Turner then filed a "Complaint for Visitation" in the Circuit Court for Harford County, naming Kelly Whisted as defendant and seeking visitation with Jeffrey. Pursu-

ant to Maryland Code (1974, 1991 Repl.Vol.), Estates and Trusts Article, § 1–206(a), which provides that "[a] child born or conceived during a marriage is presumed to be the legitimate child of both spouses," Jeffrey is presumed to be the legitimate child of Danny Whisted. Apparently recognizing this presumption, Turner later amended his complaint naming Danny Whisted as an additional defendant.

In addition, Turner filed a "Motion for Blood Test" to establish that he was Jeffrey's biological father. The Whisteds, each by separate counsel, filed a Motion to Strike Turner's Motion for Blood Test. The circuit court assumed Turner's request for blood tests to be pursuant to Md.Code (1984, 1991 Repl.Vol.), Family Law Art., § 5–1029, (Family Law Article, Title 5, Subtitle 10 will hereinafter be referred to as the "paternity statute"). The court ruled that mandatory blood tests under § 5–1029 were not available to Turner for the purpose of rebutting Jeffrey's presumed legitimacy. Consequently, the court denied Turner's motion for blood tests and granted the Whisteds' motions to strike.

Thereafter, Danny Whisted filed a Motion for Summary Judgment on the ground of laches, in which Kelly Whisted joined. The circuit court granted the motion and Turner appealed to the Court of Special Appeals. The intermediate appellate court, in an unreported opinion, disagreed with the circuit court's dismissal of the action by summary judgment, finding that the issue of "whether [Turner had] delayed too long in seeking visitation was very much in dispute." Accordingly, that court remanded the case to the circuit court for a resolution of the conflicting evidence related to the extent of Turner's delay in bringing his action.

The Court of Special Appeals then looked to the remaining issue of whether Turner was entitled to have all of the parties submit to a blood test. Viewing the Motion for Blood Test in the same posture as did the circuit court, the intermediate appellate court agreed that Turner "may not initially use the blood test provisions of the paternity statute to overcome the presumption of legitimacy of the child

herein." We granted Turner's petition for writ of certiorari to determine:

"Whether a male individual who claims to be the father of a child born to a married couple is entitled to petition a circuit court for a blood test to determine paternity for the purpose of determining whether said male individual is the biological father of the child when the child was conceived prior to the marriage of said married couple."

Initially we note that neither Turner's Complaint for Visitation nor his Motion for Blood Test contains a single reference to the paternity statute. Indeed, as a result of the State's Attorney's refusal to consent to Turner's action under the paternity statute, Turner invoked the equitable powers of the court to grant visitation. As grounds for his Motion for Blood Test, Turner cites § 1–208 of the Estates & Trusts Article and this Court's opinion in *Thomas v. Solis*, 263 Md. 536, 283 A.2d 777 (1971). Md.Code (1974, 1991 Repl.Vol.), Estates & Trusts Art., § 1–208 provides in relevant part:

"(b) *Child of his father.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father

(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings; or

(2) Has acknowledged himself, in writing, to be the father; or

(3) Has openly and notoriously recognized the child to be his child; or

(4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father."

In *Thomas,* an unwed father, wishing to protect his visitation rights and to assure entitlement to notice of any attempted adoption of the child, sought a declaratory judgment that he was the child's natural father. This Court

held that compliance with any of the four methods set forth in § 1–208 of the Estates & Trusts Article was sufficient to achieve this end. 263 Md. at 544, 283 A.2d at 781.

▆ Referring to § 1–208 of the Estates & Trusts Article, we have on several occasions

"indicated that a 'liberal interpretation' of our legitimation statute was essential; that it was 'not limited in its scope and application to matters of inheritance only' but was legally sufficient 'to establish other rights, ... arising from the relationship existing between parent and legitimate issue,' ... and that the status sought by the father was afforded to him by compliance with the legitimation statute."

*Bridges v. Nicely*, 304 Md. 1, 7–8, 497 A.2d 142, 145 (1985), quoting *Thomas*, 263 Md. at 542, 283 A.2d at 780. *See also Dawson v. Eversberg*, 257 Md. 308, 262 A.2d 729 (1970). Consequently, we believe that Turner, alleging that Jeffrey was a child "born to parents who have not participated in a marriage ceremony with each other," quite properly cited § 1–208 of the Estates & Trusts Article as a basis upon which he could seek to establish his status as Jeffrey's natural father.

Most recently in *Taxiera v. Malkus*, 320 Md. 471, 578 A.2d 761 (1990), this Court implicitly recognized that paternity could be established by a statutory action in a paternity proceeding under the Family Law Article or in an equitable action under the Estates & Trusts Article. In *Taxiera*, we noted the reciprocal references in the two articles. Section 5–1005 of the Family Law Article states: "An equity court may determine the legitimacy of a child pursuant to § 1–208 of the Estates & Trusts Article." Conversely, § 1–208 provides that one way to legitimize a child is if the father "[h]as been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings." 320 Md. at 478–79, 578 A.2d at 764. Thus, the legislature offered a choice of actions by which one could seek to establish paternity.

Indeed, over two decades earlier, the Court acknowledged that one might seek a declaration of paternity under either the paternity statute or in equity. In *Shelley v. Smith,* 249 Md. 619, 241 A.2d 682 (1968), the Court could

"see no reason why the child's rights to inherit from M should in any respect depend on whether M's paternity was established in a paternity proceeding pursuant to [the paternity statute] or in an equity proceeding like the case at bar. And if that be so then *the rules of evidence controlling the proof of paternity ought to be the same in either case."* (Emphasis added).

*Id.* at 630, 241 A.2d at 688. *See also Staley v. Staley,* 25 Md.App. 99, 103–04, 335 A.2d 114, 118, *cert. denied,* 275 Md. 755 (1975). Consequently, we believe that § 1–208 of the Estates & Trusts Article provides an alternate avenue by which one could seek blood tests for the purpose of establishing paternity.

 For the reasons set forth below, in those cases where two men each acknowledge paternity of the same child, we believe that an action to establish paternity is more appropriately brought under the Estates & Trusts Article. As advanced by this Court in *Thomas* and *Dawson,* the Estates & Trusts Article presents the "more satisfactory" and "less traumatic" means of establishing paternity. *Thomas,* 263 Md. at 544, 283 A.2d at 781; *Dawson,* 257 Md. at 314, 262 A.2d at 732. In Turner's attempt to establish paternity under the Estates & Trusts Article, he had to rebut the presumption that Jeffrey was the legitimate child of Kelly and Danny Whisted. *See* Md.Code (1974, 1991 Repl.Vol.), Estates & Trusts Art., § 1–206. A motion for blood tests made under the Estates & Trusts Article is best analyzed as a request for a physical examination under Maryland Rule 2–423,[1] and the court has discretion to grant or deny the blood tests.

---

**1.** Blood tests are clearly a permissible discovery request under Maryland Rule 2–423. Former Maryland Rule 420, from which 2–423 was derived, provided that the court may order an examination "[w]henev-

 As a discovery request, the court may order the blood tests on motion for good cause shown. The Whisteds' legitimate interests in privacy must be considered along with Turner's relationship with Jeffrey. In *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91, *reh'g denied*, 492 U.S. 937, 110 S.Ct. 22, 106 L.Ed.2d 634 (1989), the Supreme Court was presented with a factual situation analogous to the instant case. While married to Gerald D., Carol D. had an adulterous affair with Michael H. and sometime later a child, Victoria, was born. Michael H. and Carol D., without Gerald's knowledge, had blood tests performed which conclusively established that Michael H. was Victoria's biological father. Michael H. filed an action to establish paternity and for visitation. A California statute created a conclusive presumption that a child born to a married woman living with her husband is a child of the marriage, and the statute denied Michael H. the right to prove he was Victoria's father. Michael H. contended the California statute violated his due process rights by denying him the opportunity to rebut the presumption of legitimacy. A majority of the Supreme Court upheld the California presumption and held Michael H. had no constitutionally protected right to establish his paternity of Victoria. In a plurality opinion authored by Justice Scalia and joined by Chief Justice Rehnquist, and in part by Justice O'Connor and Justice Kennedy, the Court noted that there was a common law presumption of legitimacy and that society has historically protected the integrity of the marital family unit

---

er the mental or physical condition *or the blood relationship* ... is material...." (Emphasis added). Present Rule 2-423 permits the court to order an examination "[w]hen the mental or physical condition *or characteristic* of a party or of a person in the custody or under the legal control of a party is in controversy...." (Emphasis added). The amendment is explained in the Eighty-second Report of the Standing Committee on Rules of Practice and Procedure:

"This Rule is enlarged to cover characteristics, as well as conditions. The Committee believes this change is appropriate in light of the sophisticated testing procedures now available. 'Characteristics' includes, but is not limited to, a person's blood group."

Maryland Register, Vol. 10, Issue 10, Page S-2 (May 13, 1983).

from claims of paternity by other men. The rationale was based on the promotion of family harmony, as well as a reluctance to declare the children of a married woman illegitimate. 491 U.S. at 125, 109 S.Ct. at 2343, 105 L.Ed.2d at 107. The opinion further pointed out that "to *provide* protection to an adulterous natural father is to *deny* protection to a marital father, and vice versa." [2] 491 U.S. at 130, 109 S.Ct. at 2345, 105 L.Ed.2d at 110.

Justice Brennan in a dissenting opinion noted that "[f]ive Members of the Court refuse to foreclose 'the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to and cohabiting with another man at the time of the child's conception and birth.'" 491 U.S. at 136, 109 S.Ct. at 2349, 105 L.Ed.2d at 114 (dissenting opinion). Justice Brennan pointed out that on four prior occasions, the Supreme Court had considered whether unwed fathers have a constitutionally protected interest in a relationship with their children. *See Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Justice Brennan observed that these cases

"produced a unifying theme: although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. 'When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in

**2.** It has even been suggested that to grant all putative fathers an absolute cause of action to rebut the marital presumption would interfere with the constitutionally protected right to "family integrity" of the husband, wife, and child. *See* Traci Dallas, *Rebutting the Marital Presumption: A Developed Relationship Test,* 88 Colum.L.Rev. 369, 372–77 (1988).

the rearing of his child," ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause.' " (Citations and footnote omitted.)

*Michael H.,* 491 U.S. at 142–43, 109 S.Ct. at 2352, 105 L.Ed.2d at 118–19, quoting *Lehr,* 463 U.S. at 261, 103 S.Ct. at 2993, 77 L.Ed.2d at 626, in turn quoting *Caban,* 441 U.S. at 392, 99 S.Ct. at 1768, 60 L.Ed.2d at 307.

We believe that a trial court ought to be able to consider and balance the different interests that were separately recognized by the majority and the dissent in *Michael H.* A discovery request for blood tests allows the court to weigh these competing interests. Most significantly, the determination of good cause allows the court discretion to consider the best interests of the child. *Matter of Marriage of Ross,* 245 Kan. 591, 783 P.2d 331, 338 (1989) ("Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child...."); *McDaniels v. Carlson,* 108 Wash.2d 299, 738 P.2d 254, 261 (1987) (where child is presumed legitimate, best interests of the child should be considered before ordering blood tests).

While Jeffrey is not a party to the action, Rule 2–423 permits the physical examination of a party or a "person in the custody or under the legal control of a party." Consequently, the court might even appoint counsel to represent Jeffrey's interests if it believes that those interests might be compromised by the blood test. If Jeffrey's best interests would be jeopardized by submitting to a blood test, the child's representative may then request a protective order.

█ The criteria for determining the child's best interests in cases of disputed paternity include consideration of the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs. An important consideration is the child's past relationship with the putative father. *Ross,* 245 Kan. 591, 783 P.2d at 338; *McDaniels,* 738 P.2d at 262.

Finally, other factors might even include the child's ability to ascertain genetic information for the purpose of medical treatment and genealogical history.

█ On remand, the trial court should consider the extent of Turner's commitment to the responsibilities of parenthood, and balance his interest in establishing his status as Jeffrey's natural father against the Whisteds' interest in protecting the integrity of the familial relationships already formed. This balance of interests should be considered in connection with the court's paramount concern of protecting Jeffrey's best interests.

█ Turner's motion for blood tests of all parties is impeded, but not absolutely precluded, by the presumption that Jeffrey is the legitimate child of Danny Whisted. Not being prohibited from granting the motion solely because of the presumption of legitimacy, the trial court could have, and should have, held a hearing to determine whether ordering the blood tests would be contrary to Jeffrey's best interests. *See* Traci Dallas, *Rebutting the Marital Presumption: A Developed Relationship Test*, 88 Colum.L.Rev. 369, 383 (1988) ("All putative fathers should be afforded a preliminary hearing to determine whether [a developed] relationship exists.") Accordingly, the Court of Special Appeals was in error in its determination that blood tests could not be used to rebut the legitimacy presumption. The issue of laches is not before us.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY THE PETITIONER AND ONE–HALF BY THE RESPONDENT.

ELDRIDGE, J., concurs in part and dissents in part, in which McAULIFFE, J., joins.

ELDRIDGE, Judge, concurring in part and dissenting in part:

I concur with the Court's judgment remanding this case for a determination of whether Mr. Turner is entitled to blood tests in order to establish his paternity. I do not agree, however, with the majority's statement that when two men claim paternity of a child, their dispute is more appropriately resolved under the Maryland Code (1974, 1991 Repl.Vol.), § 1–201 *et seq.* of the Estates and Trusts Article, rather than the Code (1984, 1991 Repl.Vol.), § 5–1001 *et seq.* of the Family Law Article. In addition, I dissent from the Court's position that Mr. Turner must prove that a declaration of paternity is in the child's best interests before blood tests pursuant to Maryland Rule 2–423 will be ordered.

## I.

The majority states (at 113):

"in those cases where two men each acknowledge paternity of the same child, we believe that an action to establish paternity is more appropriately brought under the Estates & Trusts Article. As advanced by this Court in *Thomas* [*v. Solis,* 263 Md. 536, 544, 283 A.2d 777, 781 (1971)] and *Dawson* [*v. Eversberg,* 257 Md. 308, 314, 262 A.2d 729, 732 (1970)], the Estates & Trusts Article presents the 'more satisfactory and less traumatic' means of establishing paternity."

In § 1–208(b) of the Estates and Trusts Article, the General Assembly set forth methods by which a natural father of a child born out of wedlock can legitimate his child. Section 1–208(b) provides:

"*Child of his father.* A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father

(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings; or

(2) Has acknowledged himself, in writing, to be the father; or

(3) Has openly and notoriously recognized the child to be his child; or

(4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father."

This portion of the statute presumes that the child being legitimated is in fact "[a] child born to parents who have not participated in a marriage ceremony with each other." That is, the child's natural parents are the mother and the man seeking to legitimate the child. It does not contemplate or provide a mechanism for the resolution of a dispute over who the natural parents are.

In prior cases, this Court has held that the legitimation statute, now codified in the Estates and Trusts Article, can provide a means for a man to establish legally a parent/child relationship. Nevertheless, each of the cases relied upon by the majority for the proposition that the legitimation statute is capable of securing rights other than inheritance, involve situations in which there was no dispute as to who was the natural father of the child, and in which the natural father sought to legitimate his children who were born out of wedlock.

For example, in *Thomas v. Solis, supra,* Thomas fathered three children out of wedlock. He sought to legitimate the children after their mother married another man in order to protect his visitation rights and to prevent the mother's husband from adopting Thomas' children without his consent. 263 Md. at 538, 283 A.2d at 778. At no point did anyone suggest that Thomas was not the children's natural father. It was in this context that the Court held that the legitimation statute "should certainly be of sufficient legal validity to establish other rights ... arising from the relationship existing between parent and legitimate issue." 263 Md. at 542, 283 A.2d at 780.

Similarly in *Dawson v. Eversberg, supra,* the natural father of children born out of wedlock had been declared to be their father in an action brought by the mother under the paternity statute, presently codified in the Family Law Article. In order to ensure that the children would be his legitimate heirs, the natural father filed an adoption proceeding. This Court suggested that when the objective was legitimation, the legitimation statute, rather than the adoption statute, provided a "less traumatic approach" for accomplishing that goal. 257 Md. at 314, 262 A.2d at 732. *See also Bridges v. Nicely,* 304 Md. 1, 497 A.2d 142 (1985) (natural father, declared to be the father in a paternity action, sought to adopt his child). In each of these cases, a paternity action had already determined that the child had been "born to parents who had not participated in a marriage ceremony with each other." § 1–208(b) of the Estates and Trusts Article. Thereafter, the natural father was able to use the Estates and Trusts provisions to legitimate the children and to secure the rights stemming from their legitimacy for himself and for the children.

None of these cases involved a dispute between two men, each of whom claimed to be the natural father. Cases of disputed paternity are more appropriately resolved under the Family Law Article. *Cf. Taxiera v. Malkus,* 320 Md. 471, 578 A.2d 761 (1990) (putative father's estate disputed paternity for purposes of inheritance, and the paternity action proceeded under the Family Law Article instead of the Estates and Trusts Article).

In this case, Mr. Turner and Mr. Whisted each has a basis under the Estates and Trusts Article for asserting that he is the child's father. Mr. Turner claims that the child, Jeffrey, was "born to parents who have not participated in a marriage ceremony with each other," *i.e.,* Mr. Turner and Mrs. Whisted, and that he acknowledged the child as his own in compliance with § 1–208(b). By filing this action asserting that he is the father, seeking blood tests and seeking visitation, Mr. Turner satisfied the requirements of § 1–208(b)(2) in that he has acknowledged himself, in writ-

ing, to be the father. *See Thomas v. Solis, supra,* 263 Md. at 544, 283 A.2d at 781 (acknowledgment of child in pleading satisfied both § 1–208(b)(2) and (b)(3)); *Hall v. Coates,* 62 Md.App. 252, 260, 489 A.2d 41, 45–46 (1985); *Skeens v. Paterno,* 60 Md.App. 48, 58, 480 A.2d 820, 825, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984).

On the other hand, Mr. Whisted claims that Jeffrey was "born or. conceived during the marriage" and, therefore, under § 1–206 of the Estates and Trusts Article, is "presumed to be the legitimate child" of Mr. and Mrs. Whisted. In order for § 1–208(b) of the Estates and Trusts Article to have a logical application, there cannot be a dispute as to whether the "parents" were married at the time of conception or birth. The provisions of the Estates and Trusts Article, because they were not designed to resolve an adversarial dispute between two men claiming paternity, require an assumption as to who is the natural father before a determination can be made concerning which section of the statute applies.

Because the Estates and Trusts Article presumes knowledge of the identity of the natural father before its legitimation procedures become meaningful, I cannot agree that the legitimation provisions of the Estates and Trusts Article are better suited to resolve a dispute between two men each claiming to be the natural father. It seems to me that the paternity provisions of the Family Law Article were better designed to resolve disputes over the identity of the natural father. Nonetheless, because the General Assembly clearly intended that there be a judicial mechanism for resolving disputes over paternity, and as no action was brought under the Family Law Article in this case, I do not dissent from the remand to afford Mr. Turner an opportunity to establish his paternity under the Estates and Trusts Article.

## II.

According to the majority, in order to resolve this dispute between a man presumed to be the father and a man who

has acknowledged his paternity under § 1–208(b), the man seeking paternity may ask for blood tests under Maryland Rule 2–423 to determine who is the natural father.[1]

In all other cases, blood tests, like other mental or physical examinations, are available upon a showing of "good cause." Rule 2–423; *Hutzell v. Boyer*, 252 Md. 227, 249 A.2d 449 (1969); *Roberts v. Roberts*, 198 Md. 299, 82 A.2d 120 (1951). In order to establish "good cause" the party requesting blood tests must demonstrate that the mental or physical character or condition of another party is material to an issue in the case. *Roberts v. Roberts, supra*, 198 Md. at 302, 82 A.2d at 122. Obviously, in the present case, the blood test results would be material to the determination of who is Jeffrey's natural father. Moreover, because the status of natural father gives rise to a presumption that the best interests of the child are served by allowing the natural father visitation, the information obtained by the blood tests is also material to Mr. Turner's request for visitation. *Ross v. Hoffman*, 280 Md. 172, 178, 372 A.2d 582, 586–587 (1977); *Ross v. Pick*, 199 Md. 341, 351, 86 A.2d 463, 468 (1952). *See also Lipiano v. Lipiano*, 89 Md.App. 571, 577–578, 598 A.2d 854, 857–858 (1991), *cert. denied*, 325 Md. 620, 602 A.2d 710 (1992).

The majority opinion, however, imposes a significant burden on a man who has acknowledged paternity as required by the Estates and Trusts Article, before blood tests can be performed. According to the majority, in order to prove "good cause" for blood tests, the alleged father must demonstrate, not that the results of the tests are material to a

---

**1.** Maryland Rule 2–423, "MENTAL OR PHYSICAL EXAMINATION OF PERSONS," provides in part:

"When the mental or physical condition or characteristic of a party or of a person in the custody or under the legal control of a party is in controversy, the court may order the party to submit to a mental or physical examination by a physician or to produce for examination the person in the custody or under the legal control of the party. The order may be entered only on motion for good cause shown and upon notice to the person to be examined and to all parties."

disputed issue, but rather that it is in the child's best interests for the court to make a determination as to paternity.

The majority has simply changed the law in a particular class of cases. The motivation for this departure apparently is the desire to avoid a result which the majority perceives as an evil, to be rectified by judicial fiat, namely the declaration that a man, other than a married woman's husband, is the father of her child. Because the determination of the identity of the natural father of this child could lead to the natural father having some rights with respect to that child, and because such rights may impinge upon the "integrity of familial relationships already formed," the majority has reconstructed the principles which govern the resolution of disputes.[2] Normally a dispute is resolved after the relevant facts are ascertained and the pertinent law is applied. Under the majority's construction, in this limited class of cases, sometimes the most relevant facts will not be ascertained in order to prevent an unsatisfactory resolution of the dispute. The father may bring an action to determine paternity but, in some cases, may not have access to the most germane evidence available to resolve this dispute, namely the results of the blood tests.

Nevertheless, according to the majority, if the man can prove that it is in the best interests of the child for him to be declared the father, blood tests will be provided. The majority has formulated a procedure whereby the trial court must determine the ultimate result, in order to discover whether that result is satisfactory, before it can ascertain the facts. If the court decides that it likes the

---

2. Maj. at 117. The majority's concern for the integrity of familial relationships already formed ignores the reality of the present case. The Whisteds were married approximately five and a half months before Jeffrey's birth. They separated six months after Jeffrey was born, and Jeffrey and Mrs. Whisted lived with Mr. Turner for a year and a half. It is unclear whether it is possible to protect the "integrity of familial relationships already formed," as it is not evident that any such relationship exists.

predicted ultimate result, then the fact finding process continues. If the court decides that it does not like the predicted ultimate result, the process ends.

I cannot subscribe to the proposition that relevant, ascertainable evidence should be excluded because it may lead to a result which the court does not like. The trial court's conjecture over whether the result will be satisfactory should not determine whether facts relevant to that result are concealed. I simply cannot agree with the majority's view that the government (through its courts) is entitled to determine in a particular case that one will be better off by the perpetuation of a falsity and the suppression of relevant, unprivileged facts.

The notion that people's best interests are served by ignorance of the facts, enforced by a governmental entity, is reminiscent of the society portrayed in George Orwell's *1984*. In that society, one of the slogans of the governing "Party," engraved on the "Ministry of Truth" building, was "IGNORANCE IS STRENGTH." [3] While concealment of the truth is a fundamental tenet of totalitarian regimes,[4] it should not be an operative principle in a free society.

I am aware of no other type of action where relevant and admissible evidence, unprotected by a recognized privilege against non-disclosure, is excluded. The majority's reasoning could lead to the exclusion of relevant admissible evidence in a number of cases. For example, in an incident recently publicized in the newspapers, two mothers gave birth to two girls in a Florida hospital. Either hospital negligence or unexplained circumstances led to the mothers returning to their homes with the wrong child. Under the majority's reasoning, in order to examine the hospital records to determine whether a switch had even occurred, the couples would have to prove that it was in the children's

---

3. George Orwell, *1984*, p. 7 (Signet ed., fourteenth printing 1956).

4. As Lenin wrote, "[t]he Communists must be prepared ... to evade and conceal the truth...." Quoted in David Shub, *Lenin*, p. 171 (Mentor Book ed., fourth printing 1953).

best interests for there to be a determination of who were their true biological parents. If a court found that each of the girls' best interests were served by remaining with the woman who took her home, the hospital records as well as any scientific evidence of parentage would be excluded.

Another example could arise in the surrogacy area.[5] It is possible with current scientific advances that an egg from one woman can, by in vitro procedures, be fertilized by the sperm of a man and then implanted into the uterus of another woman who promises to act as surrogate. Although the question of which woman is the "mother" may be a controversial one, the majority's holding would prevent the genetic background of the child from being considered in a dispute over the identity of the "mother" unless it was in the child's best interests for the court to make that determination. *See* John Lawrence Hill, *What does it means to be a "Parent"? The Claims of Biology as the Basis for Parental Rights,* 66 N.Y.U.L.Rev. 353, 363 (1991).

The suppression of relevant, admissible evidence promoted by the majority in this case is unprecedented. In certain situations, the General Assembly, after balancing the privacy interests involved, has provided for records to be sealed. For example, juvenile delinquency records are confidential so that the juvenile will not be stigmatized by a criminal record. Md.Rule 921. Likewise adoption records are sealed to protect the privacy interests of natural parents who choose to place their children for adoption. Code (1984, 1991 Repl.Vol.), § 5–309 of the Family Law Article. These instances, however, are readily distinguished from the attempt of the majority today to conceal facts material to a determination of paternity. In addition to being legislative policy determinations, these examples of sealed records prevent the future disclosure of previously ascertained

---

**5.** I note that a surrogacy dispute could arise in Maryland as the Governor vetoed Senate Bill 251 of the 1992 General Assembly session which would have rendered commercial surrogate parenting agreements unenforceable. Acts of 1992, Vetoes.

facts for collateral purposes. They do not prevent the ascertainment of these facts in the primary litigation.[6]

Even if the majority's concern over the consequences of a paternity adjudication were justified, the majority's "big brother" approach would be indefensible. Nevertheless, the majority's concern over the consequences is overstated. The admission of the blood test results would do no more than establish the true paternity of the child.[7] The best interests standard would still control the determination of visitation and custody. *See McCready v. McCready,* 323 Md. 476, 481, 593 A.2d 1128, 1130 (1991); *Domingues v. Johnson,* 323 Md. 486, 498, 593 A.2d 1133, 1139 (1991).

The ultimate determination of visitation or custody, however, should only come after careful consideration of all relevant evidence, including biological parentage. The fact of biological parentage does not automatically entitle the natural father to visitation with his child. A determination of paternity would entitle the natural father to the presumption that the child's interests will best be served by allowing the father visitation. Yet, this presumption can be

6. For example, juvenile records are sealed to prevent the juvenile from being stigmatized. Nevertheless, in the primary litigation a determination is made concerning whether the juvenile in fact committed a crime. It is the record of this finding that is sealed. Applying the majority's rationale in this situation would require the trial court to determine whether a delinquency adjudication would be in the juvenile's best interests before determining whether to hear the victim's testimony about the crime. If the juvenile's best interests would not be furthered, the victim could not testify. If the juvenile's best interests would be furthered, the victim could testify and the juvenile could be adjudicated delinquent. Obviously, this result is preposterous. Nonetheless, this is precisely what the majority suggests should be the ground rules in a case of contested paternity under the Estates and Trusts Article.

7. Moreover, the majority's opinion ignores the legitimate reasons why it may be beneficial, perhaps for medical or psychological reasons, for a child to ascertain his or her biological roots. For example, bone marrow transplants as well as kidney and other organ transplants are significantly more successful when parent or sibling donors are used. *See* Hobbs, "Displacement Bone Marrow Transplantation," 1990 *J.Inherit.Metab.Dis.* 572–596; Mickey, "Kidney Transplant Mortality Relationship," 1988 *Clin. Transpl.* 263–276.

rebutted when "some exceptional circumstances render such custody [or visitation] detrimental to the best interests of the child." *Ross v. Hoffman, supra,* 280 Md. at 178, 372 A.2d at 586–587, quoting *Ross v. Pick, supra,* 199 Md. at 351, 86 A.2d at 468. *See also Lipiano v. Lipiano, supra,* 89 Md.App. at 577–578, 598 A.2d at 857–858.

One commentator explained the illogic of the majority's position as follows:

"The question of the child's best interests, however, does not arise until the putative father has first been accorded his procedural right to standing to establish his paternity. *This is not to say that the best interests of the child are unimportant, but only that they are irrelevant to the preliminary and essential factual determination of paternity.* A successful paternity action by a putative father does not automatically entitle him to custody, for example, nor even to visitation with his child." (Emphasis added).

Jean E. McEwen, *R. McG. & C.W. v. J.W. & W.W.: The Putative Father's Right to Standing to Rebut the Marital Presumption of Paternity,* 76 N.W.U.L.Rev. 669, 688 (1981). *See Anonymous v. Anonymous,* 472 So.2d 640, 642 (Ala.Civ.App.1984), *cert. quashed,* 472 So.2d 643 (Ala.1985) (putative father entitled to blood tests upon showing of good cause, and it is not necessary for him to prove his entire case prior to the ordering of blood tests).

The approach taken by the majority disregards the reality of the modern world in which blood tests are a reliable source of information for the determination of a fact that is relevant to the attempt by Mr. Turner to establish a relationship with Jeffrey. Justice Brennan criticized a similar head-in-the-sand approach while sitting on the New Jersey Superior Court stating (*Cortese v. Cortese,* 10 N.J.Super. 152, 156, 76 A.2d 717, 719 (1950)):

"In the field of contested paternity ... the truth is so often obscured because social pressures create a conspiracy of silence or, worse, induce deliberate falsity."

In my opinion, the majority's opinion today contributes to this conspiracy of silence by authorizing the concealment of a fact that is relevant to the determination of visitation and ascertainable with a high degree of accuracy.

Judge McAULIFFE has authorized me to state that he concurs with the views expressed herein.