IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 4, 2004

IN RE L.C.B.

Appeal from the Chancery Court for Humphreys County
No. CH-03-016     Leonard W. Martin, Chancellor

No. M2003-02560-COA-R3-CV - Filed February 4, 2005

M.B. and P.B. were husband and wife with four children born during the marriage.  L.C.B., the fourth of these children, was born in 1997, nine years after M.B. had undergone a vasectomy.  P.B. had engaged in an extramarital affair with R.D. and subsequent to the divorce of M.B. and P.B., the relationship between R.D. and P.B. ripened into marriage with P.B. becoming P.D.  In the case at bar, R.D. and P.D. sued to establish R.D. as the biological father of L.C.B. and to terminate the parental rights of M.B.  An answer and counterclaim was filed by M.B. denying the allegations of the complaint and seeking to terminate the parental rights of R.D.  Holding that the claim of R.D. was barred by laches, the trial court dismissed the complaint.  We hold that the complaint of R.D. is not barred by laches but affirm the action of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court affirmed in part, reversed in part, remanded

WILLIAM B. CAIN, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and WILLIAM C. KOCH, JR., P.J., M.S., joined.

Jennifer Davis Roberts, Dickson, Tennessee, for the appellants, R.D. and P.D..

David D. Wolfe, Dickson, Tennessee, for the appellee, M.B.

OPINION

P.B and M.B. were married in 1981.  There were four children born to that marriage.  The fourth of these children, the subject of this controversy, was born in 1997, nine years after M.B. had undergone a vasectomy.  At the time of conception of L.C.B., P.B. was engaged in an extramarital affair with R.D.  The testimonial record reveals that M.B. knew of his wife's affair prior to L.C.B.'s birth, and that two months after her birth M.B. confirmed that his prior vasectomy resulted in a negative sperm count:

Q.	And approximately two months – sometime in either June or July after L.C.B.'s birth, did you in fact go and have a sperm count test?

A.	I did in July.

Q.	And what were the results of that sperm count test?

A.	There was no active sperm.

Q.	Was there questions between – at that point in time did you question your then wife about the paternity of L.C.B?

A.	It was more of a question about my wife's actions.

Q.	Well, explain. You wanted to know if she was messing around with somebody else?

A.	Exactly.

Q.	And as a result of that, did that lead to the issue of is L.C.B. my biological child or not?

A.	That led me to believe that I might not possibly be her biological father.

Q.	And sometime after that, you and she started having marital difficulty?

A.	Well, we had had issues before that when I had found out that her and R.D. had a relationship long before then. I found that out in 1993 that she confessed that that had begun in '92, and then I found some writings that actually pointed to the fact that they had been together in 1980 prior to us even starting to date. So, yeah, I mean, every marriage has problems. So, no, we did not have a perfect marriage.

Q.	Ultimately, after this issue of paternity was raised, you-all started having serious problems that ultimately led to your divorce; is that correct?

A. After we went to counseling and it was proven that she was not going to end her relationship with R.D. Based on her actions I filed for divorce.

At the time the parties divorced two years later, M.B. agreed in the marital dissolution agreement to provide support and share parental custody of all four children of the marriage, including L.C.B. According to the MDA, the parties were expected to agree to a custody and visitation schedule. No such schedule occurred.

R.D., despite his own knowledge of M.B.'s prior vasectomy, made no move to establish his paternity of L.C.B. during this period. In fact, two years passed, and R.D. married P.B. Another year passed, and R.D. and P.D. submitted themselves and L.C.B. to DNA testing. This test established a 99.999 percent probability that R.D. is L.C.B.'s biological father. Also during this one-year period of time M.B. filed a petition seeking sole custody of the three older children, leaving L.C.B. subject to the joint custody arrangement, and seeking a concomitant reduction in child support. The record does not disclose how much time lapsed between M.B.'s petition to change custody and R.D.'s petition to establish paternity filed in juvenile court; nonetheless, armed with the paternity test results, the petitioners R.D. and P.D. filed first in juvenile court, and then in Chancery Court for Humphreys County, a petition to establish paternity which alleged in pertinent part:

4. The Petitioner was having a sexual relationship with the natural mother of the minor child at the time she was conceived and does verily believe that the [sic] he is the natural father of the minor child.
5. The Petitioner married the natural mother of the child on May 27, 2001 and at that time, the Petitioner acquired physical custody of the minor child.
6. The Petitioner and the minor child have been submitted to paternity testing, and that DNA parentage Test Report shows that the Petitioner is in fact the biological father of the minor child, see attached Exhibit A.
7. The Petitioner wishes to have the child legitimated so all the legal rights and responsibilities associated therewith can be established and he verily believes it to be in the best interest of the minor child for this Petition to be granted.
8. The natural mother of the minor child, P.D. does join in this Petition as she believes it to be in the best interest of the minor child.
9. Petitioner would respectfully ask this Court to terminate the parental rights of M.B.. The requested termination of the parental rights of the Respondent, M.B., if granted, shall have the effect of forever severing all rights, responsibilities and obligations of the Respondent to the child. Upon termination the Petitioner shall

-3-

be declared to be the natural father of the subject child. Upon termination, the Respondent shall have no further right to notice of proceedings in reference to the child by the Petitioner or other persons and that the Respondent shall have no right to have any relationship, legal or otherwise, with the child.

10. Petitioner would state that it would be in the best interest for the child's surname [to] be changed to D.

Despite its caption as a petition to establish paternity, the prayer for relief requests not only the establishment of R.D. as L.C.B.'s parent but also "that upon a hearing in this case, the Respondent, M.B.'s, parental rights to the minor child be forever terminated."

M.B. answered and counterclaimed alleging in pertinent part:

9) It is denied that there is any factual or legal basis alleged or existing to allow this Court to terminate the parental rights of the Respondent M.B. regarding this child. The Respondent would show that this Petition constitutes a collateral attack on the prior judgment of divorce entered by this Court on November 2, 1999. At that time, M.B. and P.B. were granted a divorce, and this Court order legally established that the minor child [L.C.B.] was a child born to these parties during the marriage and therefore was the legal child of the Respondent M.B.. The Respondent would show that the Petitioner was aware of the divorce action at that time, and was aware that the Respondent and P.B. were treating the minor child as the Respondent's child. The Petitioner was apparently aware that he might have a claim to paternity of the child, and that he had a right to assert that claim, and yet took no action to assert any claim or right. The Petitioner's failure to assert any right or claim operates as a bar to his asserting any claim to paternity at this time. The Petitioner is estopped from asserting the claim for paternity.

10) It is denied that it is in the best interests of the child that the Petitioner be granted any of the relief sought. The minor child is now almost six (6) years old and knows only the Respondent as her father.

11) All other allegations of the Petition are denied.

. . .

4) The Counter-Petitioner would show that in the event the Counter-Respondent has any claim to paternity of the minor

-4-

child, he has abandoned the minor child and any parental rights which he may assert should be terminated.

Following a trial on September 3, 2003, the trial court on September 26, 2003, entered its judgment holding P.D. to be barred by judicial estoppel and R.D. to be barred by laches. The court did not address the counter complaint of M.B., but since the relief sought in the counter complaint was contingent upon the success of R.D. under the allegations of the complaint, we will treat the judgment as final. While both R.D. and P.D. are parties to the appeal, the only issue raised by them on appeal is:

"Whether the trial court erred in ruling that the appellant (R.D.) was barred by the doctrine of laches from asserting his claim of paternity of the minor child, L.C.B."

In holding R.D. to be barred by laches, the trial court said:

> The Court finds that while the Petitioner introduced evidence of a paternity test indicating a high probability of his paternity of the minor child, that his claim for paternity are barred by laches in that the proof has demonstrated that the Petitioner knew of the issue of his paternity of this child for many years, was aware of the fact that the parties M.B. and his wife at the time, P.B., were going through a divorce and custody proceedings in the Chancery Court of Humphreys County which dealt with [L.C.B.] as the child of M.B. and P.B., and the Petitioner has rested on his rights and thereby lost them.

For R.D.'s petition to be so barred, the delay during which he slept on his rights must of necessity have operated to prejudice M.B. in some way. This requisite of prejudice has been explained by this court.

> Laches is established when there has been "neglect or omission to assert a right which, taken in conjunction with a lapse of time, causes prejudice to the adverse party." *First American Bank of Nashville v. Woods*, 734 S.W.2d 622 (Tenn.App. 1987), perm. app. denied, (1987). Courts are reluctant to apply the defense of laches and in a case where delay in filing suit can reasonably be explained or justified, the defense will not be applied. *Freeman v. Martin Robowash, Inc.*, 61 Tenn.App. 677, 457 S.W.2d 606 (Tenn.App. 1970).

*Shell v. Law,* 935 S.W.2d 402, 410 (Tenn.Ct.App. 1996).

Under the circumstances, the laches finding is not supported by the record. The proof before the trial court clearly establishes that R.D. is, in fact, the biological father of the minor child L.C.B. The establishment of the petitioner's parentage, however, does not operate to terminate the parental rights of an existing custodial father, especially in a situation where the custodial father has exercised his custodial rights and has accepted his parental responsibilities all at a time when the biological father, aware of his familial obligation and parental rights, slept on those rights and shirked that obligation.

Laches being inapplicable in this case, and the proof clearly showing that R.D. is the biological father of L.C.B., this court so holds. The issues in the case must therefore be resolved under principles laid down by this court in *State ex rel. Cihlar v. Crawford* 39 S.W.3d 172 (Tenn.Ct.App. 2001).

In Cihlar this court considered at great length the dramatic changes in the law effected by chapter 477 of the Public Acts of 1997, codified as Tenn.Code.Ann § 36-2-301 et seq. Said the court:

> However, in 1997 and in practical recognition of modern realities, the General Assembly unambiguously disavowed *Cunningham v. Golden,* thereby signaling that it no longer acquiesced in the courts' deference to the ancient presumption of marital parentage. Tenn.Code Ann. § 36-2-304(c) explicitly abolishes this presumption. In its place, the General Assembly recognized five rebuttable parentage presumptions. Two of these presumptions are the presumption of parentage arising from a man's marriage to a child's mother at the time of conception, *see* Tenn.Code Ann. § 36-2-304-(a)(1), and the presumption of parentage arising from a genetic test showing a statistical probability of 95% or more that a particular man is a child's biological father. *See* Tenn.Code Ann. § 36-2-304(a)(5).

*State ex rel. Cihlar v. Crawford*, 39 S.W.3d at 172, 184 (Tenn.Ct.App. 2000).

This statutory strengthening of the hand of the biological parent does not supplant or destroy the rights of the husband who was in lawful wedlock with the biological mother at the time of the birth of the child. This is particularly true in situations like the case at bar where a biological father who has shirked his responsibilities since the birth of the child seeks to interpose his bare "planting of the seed" as a trump card to dwarf all other considerations. The problem that was posed but not resolved in Cihlar must be addressed in the case at bar. In footnote 13, the Cihlar court observed:

> The parentage statutes, at least implicitly, permit more than on person to claim parentage of a child. *See* Tenn.Code Ann. § 36-2-305(b)(2) (stating that "several men may be named as the father"). These persons may claim the benefit of one or more of the presumptions in Tenn.Code Ann. § 36-2-304(a).

*State ex rel. Cihlar v. Crawford*, 39 S.W.3d at 184 (Tenn.Ct.App. 2000).

This problem was evaded in Cihlar because while the proof clearly established that Mr. Cihlar was the biological father of the child, the proof clearly established that the husband, Mr. Crawford, had never significantly contributed to the support of the child or made any efforts to establish a substantial relationship with the child. Not so the case at bar; for it is clear from the proof that it is M.B. who has been the *de facto* father of L.C.B. since her birth and that R.D. has contributed nothing.

In establishing the statutory procedure for resolving parentage disputes in a manner to assure that the interest of persons like M.B. are protected, the court held:

> There are two essential ingredients. First, the procedure must comply with minimum procedural due process requirements which include adequate notice, and opportunity to present evidence, and a decision based on the evidence by an impartial trier-of-fact. Second, the procedure should enable the trier-of-fact to consider the level of commitment to parenthood that the presumptive father or fathers have demonstrated. Accordingly, courts called upon to resolve parentage disputes should be able to take into consideration: (1) the stability of the child's current family environment, (2) the existence of an ongoing family unit, (3) the source or sources of the child's support, (4) the child's relationship with the presumptive father, and (4) [sic] the child's physical, mental, and emotional needs. *See Turner v. Whisted*, 327 Md. 106, 607 A.2d 935, 940 (1992).

*State ex rel. Cihlar v. Crawford*, 39 S.W.3d at 172, 185 (Tenn.Ct.App. 2000).

In ruling on this case, the trial court observed:

> Now as a matter of equity, as a matter of fairness, M.B. has already suffered a number of indignities and injustices at the hands of these two individuals. They've interfered with his marriage vow. They've had an extramarital relationship outside the bonds of marriage. They've said he's the father. They've took his money and his child support all this time and now they come along and want to add insult to injury by cutting him out.
>
> The real issue in this lawsuit is a control issue. She doesn't like him and he doesn't particularly like her apparently, as I hear it, and if she ever gets control, don't you think for a minute that he'll dance to her tune or he won't go to the dance. She wants control and she sees the way to get it is through her husband, R.D., and cut him out. Now I

don't think that's fair. I don't think it's proper. And more importantly, I told you early on that the granddaddy rule of all in these cases is what is in the best interest of the child.

I think it is in the best interest of this little six year old girl that she can continue to have a relationship both with her mother as well as her father, M.B., as well as with R.D.

You folks created this situation. you created this mess. It may not be to your liking but it is what you created. It is not fair to cut him out. And if he gets cut out, he'll be cut out by an appellate court, not by this court.

Aside from establishing his biological parent status, R.D. and his now wife, P.D., seek to terminate the parental rights of M.B. The trial court found . . . "that based upon the testimony of the nature of the relationship between (M.B.) and the minor child (L.C.B.), it is in the best interests of the minor child to continue the relationship between the child and (M.B.) as the father." The record in this case is devoid of any basis for terminating the parental rights of M.B. on any grounds provided by Tenn.Code Ann. § 36-1-113. Even if such grounds exist, parental rights cannot be terminated except upon a finding by clear and convincing evidence that such termination is in the best interest of the child. *In re H.E.J.* 124 S.W.3d 110,115 (Tenn.Ct.App. 2003).

Facing a clear and convincing evidence burden on this issue, P.D. offers no evidence at all.

The finding of the trial court that R.D. is barred by laches is reversed. The proof establishes that R.D. is the biological father of L.C.B. In all other respects, the judgment of the trial court dismissing the complaint of R.D. and P.D. is affirmed, and the case is remanded for such other proceedings as may be necessary.

Costs are assessed against appellants.

_____
WILLIAM B. CAIN, J.

-8-